The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on May 19, 2021, which may be different from its entry on the record.

**IT IS SO ORDERED.**

**Dated: May 19, 2021**



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| JOHN W. STRUHAR, SR., | ) | Case No. 20-11957 |
| Debtor. | ) | |
| | ) | Judge Arthur I. Harris |
| _____ | ) | |
| | ) | |
| CUTTING EDGE CONSTRUCTION | ) | |
| INC. d/b/a/ CUTTING EDGE | ) | |
| DECORATIVE CONCRETE, | ) | |
| Plaintiff. | ) | Adversary Proceeding |
| | ) | No. 20-1073 |
| v. | ) | |
| | ) | |
| JOHN W. STRUHAR, SR., | ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION[1]

In this adversary proceeding, creditor Cutting Edge Construction Inc. d/b/a

Cutting Edge Decorative Concrete ("Cutting Edge") seeks a determination that the

---

[1] This Opinion is not intended for official publication.

debtor is personally liable for a nondischargeable debt for unpaid auction proceeds following an online auction conducted by the debtor's wholly-owned corporation, Bottomline Auctions Inc. ("Bottomline Auctions"). On April 23, 2021, the Court conducted a trial on Cutting Edge's claim that the debtor personally guaranteed payment of the unpaid auction proceeds and that this debt should be nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. For the reasons that follow, the Court finds that Cutting Edge has established this claim by a preponderance of the evidence. The Court therefore enters a nondischargeable judgment in favor of Cutting Edge and against the debtor in the amount of $5,165.77.

## JURISDICTION

This Court has jurisdiction over this action. Determinations of dischargeability under 11 U.S.C. § 523 are core proceedings under 28 U.S.C. § 157(b)(2)(I) and Local General Order No. 2012-7, entered by the United States District Court for the Northern District of Ohio. In addition, both parties have expressly consented to entry of final orders or judgment by the bankruptcy court (Docket No. 5). *See* 28 U.S.C. § 157(c) and (e); *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 686 (2015) ("Article III permits bankruptcy courts to decide *Stern* claims submitted to them by consent."); *see also Hart v. S. Heritage Bank*

2

*(In re Hart)*, 564 F. App'x 773, 776 (6th Cir. 2014) (bankruptcy court has constitutional authority to enter a final monetary judgment in nondischargeability action under § 523(a)(2)(B)).

## PROCEDURAL HISTORY

On April 13, 2020, the debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code (Case No. 20-11957, Docket No. 1). On July 20, 2020, Cutting Edge filed this adversary proceeding seeking a determination that the debtor is personally liable for a nondischargeable debt for unpaid auction proceeds following an online auction conducted by the debtor's wholly-owned corporation, Bottomline Auctions. In Count One, Cutting Edge asserts that the debt is nondischargeable for defalcation while acting in a fiduciary capacity under § 523(a)(4). In Count Two, Cutting Edge asserts that the debt is nondischargeable for false representation or fraud under § 523(a)(2)(A).

On January 21, 2021, the debtor moved for summary judgment arguing (1) that the debt owed to Cutting Edge was incurred by Bottomline Auctions, (2) that any allegedly wrongful actions were by Bottomline Auctions, not by the debtor personally, and (3) that there was no evidence to justify piercing the corporate veil (Docket No. 10).

3

On March 22, 2021, the Court granted summary judgment in favor of the debtor as to Count One. The Court held that Cutting Edge could not establish the elements for defalcation under § 523(a)(4), because neither Bottomline Auctions nor the debtor ever held the auction proceeds in trust for Cutting Edge within the meaning of § 523(a)(4) under applicable Sixth Circuit case law. For example, although it may come as a surprise to sellers who contract with online auction companies, under Ohio law online auction companies are not treated as holding proceeds in trust for the parties whose items are being auctioned (*see* Docket No. 17 at pgs. 13-14).

The Court denied summary judgment as to Count Two of the complaint. The Court held that even if there was no evidence to justify piercing the corporate veil, there was sufficient evidence to support a claim that the debtor personally guaranteed payment of the unpaid auction proceeds and that the debtor's own statements could constitute fraudulent misrepresentation, making the debt nondischargeable under § 523(a)(2)(A).

The Court held a trial as to Count Two on April 23, 2021, with the witnesses and their attorneys appearing remotely through contemporaneous transmission. *See* Bankruptcy Rule 9017 and Civil Rule 43(a). The Court heard testimony from the debtor and from Greg Mata, the president and sole owner of Cutting Edge. The

4

Court received joint stipulated exhibits 1-3 and received without objection debtor's

exhibits 1-3. This memorandum constitutes the Court's findings of fact and

conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy

Procedure.

FINDINGS OF FACT

The findings of fact contained in this memorandum of opinion reflect the

Court's weighing of the evidence, including the credibility of each witness. In

doing so, "the court considered the witnesses' demeanor, the substance of the

testimony, and the context in which the statements were made, recognizing that a

transcript does not convey tone, attitude, body language or nuance of expression."

*In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically

mentioned in this decision, the Court considered the testimony of the trial

witnesses and the exhibits admitted into evidence. Unless otherwise indicated, the

following facts were established at trial by a preponderance of the evidence or

were stipulated to by the parties.

The parties submitted the following stipulations:

1. The debtor was the sole equity owner of Bottomline, which
operated as an auction mediation company from 2009 until
January 2020 (Docket No. 10).

2. On September 1, 2019, Bottomline entered into an agreement with
Cutting Edge which stated that Bottomline would provide auction

5

mediation services for equipment owned by Cutting Edge (Docket No. 10).

3.  A Copy of the Agreement, signed by Greg Mata, President of Cutting Edge and a representative of Bottomline is appended [to the joint stipulations] as Joint Exhibit 1.

4. According to the agreement, Cutting Edge was to receive 68 percent of the auction proceeds from Bottomline after the sale of the equipment, and Bottomline would receive a 32 percent commission (*Id.*).

5. As a result of an auction in August 2019 and an auction in September 2019, Cutting Edge was to receive from Bottomline proceeds totaling: $5,165.77. (hereinafter the "Cutting Edge Auction Proceeds")[.]

6. Bottomline summarized the Cutting Edge Auction Proceeds in its ordinary business record "Settlement" Documents appended [to the joint stipulations] as Exhibits 2 and 3.

7. In his Chapter 7 Petition, Debtor listed the Cutting Edge Auction Proceeds as an unsecured debt held by "Cutting Edge Construction" in the amount of $5,084.

8. The Debtor checked the box to indicate that the debt was incurred by John W. Struhar, Sr. ("debtor 1 only,") and classified the debt as a nonpriority unsecured claim "business charge-off."

9. The debtor did not check the boxes to indicate that the claim was contingent, unliquidated, or disputed.

10. No funds were remitted by Bottom[l]ine to Cutting Edge following the auction sales in August and September 2019 (Docket No. 1, paragraph 11; Docket No. 4, paragraph 11).

11. On April 13, 2020, the debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code (Case No. 20-11957, Docket No. 1).

6

*See* Docket No. 24.  Although there was some testimony that the amount of the auction proceeds listed in the stipulated exhibits may have been calculated on a 35 percent commission instead of the agreed 32 percent commission, the Court will not disturb the parties' stipulation that the amount of the auction proceeds due Cutting Edge is $5,165.77.

An auction mediation company is "a company that provides a forum through the internet for a person to sell the person's real or personal property via the submission of silent bids using a computer or other electronic device."  Ohio Rev. Code Ann. § 4707.01(G).  The agreement between Cutting Edge and Bottomline Auctions states that "[t]he Seller shall submit a check in the mail for the full amount of the bid price, (less the agreed upon % and any agreed upon fees) to the Owner 20 business days after items are picked up from the sale" (*Id.*).  Following the sale, Bottomline Auctions had insufficient funds to pay Cutting Edge the money that was due under the agreement (Docket No. 10).  Mr. Mata expected Cutting Edge to receive its share of the auction proceeds within about one month of the sale.  When Cutting Edge did not receive any money from the sale within a month, Mr. Mata contacted the debtor's son, Jimmy Struhar, to ask why Cutting Edge had not yet received the auction proceeds.  Mr. Mata was told that a check for the auction proceeds was in the mail and Cutting Edge should receive it shortly.

7

Cutting Edge never received a check. Mr. Mata was also offered merchandise that Bottomline Auctions had in its warehouse that he could resell in lieu of cash payment for the auction proceeds. Mr. Mata declined that offer and persisted in trying to obtain the auction proceeds, and was told that Bottomline Auctions was working on "other avenues" to try and get Cutting Edge the money.

After contacting Bottomline Auctions and having no success in retrieving the auction proceeds, Mr. Mata noticed items listed for auction on the website for Bottomline Auctions that he had previously seen at the company's warehouse. Mr. Mata suspected that Bottomline Auctions was liquidating its inventory and would be closing. On the day that Mr. Mata believed the auction winners would be picking up items from the warehouse, Mr. Mata drove from Richfield to Bottomline Auctions in Elyria to confront the debtor. Mr. Mata believed that Bottomline Auctions would be collecting proceeds from the auctions and would have funds on hand to pay what Cutting Edge was owed under the agreement. Mr. Mata testified at trial that he wanted to publicly confront and embarrass the debtor and recover the auction proceeds owed to Cutting Edge.

At the warehouse, Mr. Mata spoke with either Jimmy Struhar or both Jimmy Struhar and the debtor, who indicated that they should discuss the matter at a location across the street instead of at the warehouse. Across the street, Mr. Mata

8

informed the debtor that Mr. Mata had come to collect the auction proceeds owed

to Cutting Edge under the agreement.  The debtor explained to Mr. Mata that

Cutting Edge was struggling financially and did not have the money to pay Cutting

Edge.  Mr. Mata then told the debtor that if the debtor could not at least give a

timeline as to when Cutting Edge would receive the auction proceeds, Mr. Mata

would go to the police and speak to a lawyer.  After Mr. Mata mentioned taking

legal action, the debtor then told Mr. Mata that he "personally promise[d]" that

Cutting Edge would receive the proceeds and that the debtor "has never screwed

anyone before and [was] not going to start now."  The debtor assured Mr. Mata

that Cutting Edge would receive the proceeds within two weeks.  Mr. Mata then

left and returned to Richfield.

Mr. Mata did not hear from the debtor or anyone else from Bottomline

Auctions over the next two weeks.  After two weeks was up, Mr. Mata went to the

Richfield Police Department to discuss possible charges regarding the auction

proceeds.  Mr. Mata was told that he would face an uphill battle in pursuing

charges for the auction proceeds, and that he would have to contact the police and

prosecutor in Lorain County.  Mr. Mata took no further legal action against

Bottomline Auctions or the debtor until the commencement of this adversary

proceeding.

CONCLUSIONS OF LAW

The only issues at trial were whether the debtor was personally liable for the unpaid auction proceeds and whether Cutting Edge had established the elements for nondischargeability under § 523(a)(2)(A).

At trial, Cutting Edge did not attempt to establish the debtor's personal liability for the unpaid auction proceeds through veil piercing. Rather, Cutting Edge maintained that the debtor personally guaranteed payment of this debt when Mr. Mata confronted the debtor in person, demanded payment immediately, and threated to go to the police or take other legal action if the debt was not paid.

The Court concedes that there is no way to know exactly what happened or what was said when Mr. Mata drove to confront the debtor. However, the circumstantial evidence suggests that the debtor did in fact personally guarantee that Cutting Edge would receive the auction proceeds. For example, the alleged personal guarantee would not have been the first false assurance made regarding the auction proceeds; Mr. Mata was previously told that a check for the auction proceeds was in the mail, but no such check was ever received. Additionally, Mr. Mata confronted the debtor on a busy day at an inconvenient time when the debtor likely wanted Mr. Mata to leave so that the debtor could get back to work. According to Mr. Mata, the debtor's "personal promise" to make sure Cutting

10

Edge received the auction proceeds came after Mr. Mata warned the debtor that he

intended to go to the police and consult an attorney. It is not improbable that the

debtor wanted to avoid dealing with a potential lawsuit or criminal investigation.

Therefore, considering all the evidence, the Court finds it more likely than not that

the debtor personally guaranteed payment of the $5,165.77 in auction proceeds

owed to Cutting Edge.

Just because the debtor personally guaranteed the debt that Bottomline

Auctions owed to Cutting Edge does not make the debt nondischargeable under

§ 523(a)(2)(A). Cutting Edge must also establish each of the elements for

nondischargeability under § 523(a)(2)(A) by a preponderance of the evidence.

Section 523 provides in pertinent part:

(a) A discharge under section 727 . . . of this title does not discharge
    an individual debtor from any debt—
    . . . .
    (2) for money, property, services, or an extension, renewal, or
    refinancing of credit, to the extent obtained by—

    > (A) false pretenses, a false representation, or actual fraud,
    > other than a statement respecting the debtor's or an
    > insider's financial condition . . . .

To except a debt from discharge for false representation under § 523(a)(2)(A), a

creditor must prove: (1) the debtor obtained money through a material

misrepresentation that, at the time, the debtor knew was false or made with gross

recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the

creditor justifiably relied on the false representation; and (4) its reliance was the

proximate cause of the loss. *Rembert v. AT&T Universal Card Servs. (In re

Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). The creditor must demonstrate

justifiable reliance under this section and need not pass the higher standard of

reasonable reliance. *Field v. Mans*, 516 U.S. 59, 74-75 (1995).

A debt may also be excepted for discharge under § 523(a)(2)(A) for "actual

fraud." In *Husky Intern. Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1590 (2016), the

Supreme Court held that the term "actual fraud" in § 523(a)(2)(A) includes

fraudulent schemes even when those schemes do not involve a false representation,

such as a fraudulent conveyance of property made to evade payment to creditors.

For example, if the debtor's use of Bottomline Auctions were all part of an

elaborate fraud to sell the equipment of entities such as Cutting Edge with no

intention of turning over the proceeds, that would establish nondischargeability for

"actual fraud" under § 523(a)(2)(A).

Section 523(a)(2)(A) expressly excludes all statements respecting a debtor's

financial condition, whether written or oral, as a basis for nondischargeability.

*Prim Capital Corp. v. May (In re May)*, 368 B.R. 85, 2007 WL 2052185 at *5

(B.A.P. 6th Cir. 2007). Instead, statements respecting a debtor's financial

12

condition fall under § 523(a)(2)(B). A debt based upon an oral misrepresentation of financial condition is not actionable and will be dischargeable. *Id.* The United States Supreme Court has recently held that the term "statement . . . respecting the debtor's . . . financial condition" should be interpreted broadly, encompassing even a statement about a single asset. *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1764 (2018). Writing for the Court, Justice Sotomayor explained that creditors still benefit from the protection of § 523(a)(2)(B) so long as they insist that the representations respecting the debtor's financial condition on which they rely in extending money, property, services, or credit are made in writing. *Id.* Doing so will likely redound to their benefit, as such writings can foster accuracy at the outset of a transaction, reduce the incidence of fraud, and facilitate the more predictable, fair, and efficient resolution of any subsequent dispute. *Id.*

In Count Two of the complaint, Cutting Edge alleges that the debt is nondischargeable under § 523(a)(2)(A). To make a determination of nondischargeability for false representation under § 523(a)(2)(A), Cutting Edge must first show that "the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth." *Rembert*, 141 F.3d at 280-81.

13

The Court finds that the debtor did "obtain[] money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth." *Rembert*, 141 F.3d at 280-81. According to both Mr. Mata's and the debtor's testimony, when Mr. Mata went to Elyria to confront the debtor, the debtor informed Mr. Mata that Bottomline Auctions did not have the money to pay Cutting Edge what it was due under the agreement. After being informed that Bottomline Auctions did not have the money to pay Cutting Edge, Mr. Mata informed the debtor of his plans to contact the police and consult with an attorney if the auction proceeds were not turned over to Cutting Edge. In response to this statement, the debtor "personally promised" Mr. Mata that Cutting Edge would receive the auction proceeds within two weeks.

Statements respecting a debtor's financial condition, whether written or oral, are not actionable under § 523(a)(2)(A). *In re May*, 2007 WL 2052185 at *5. However, the personal guarantee by the debtor in this case was not a statement respecting financial condition under § 523(a)(2)(A). If the debtor had claimed, for example, that Bottomline Auctions would soon be receiving a large sum of money and would be able to pay Cutting Edge in two weeks, that would be a statement respecting the financial condition of Bottomline Auctions. However, the debtor's "personal[] promise" that Cutting Edge would receive the auction proceeds within

14

two weeks was not a statement respecting financial condition. Such a guarantee was not a claim that the debtor or Bottomline Auctions had the *ability* to pay, but that the debtor or Bottomline Auctions *would* pay the money owed to Cutting Edge.

Mr. Mata drove approximately fifty minutes to publicly confront the debtor during a busy day at the warehouse owned by Bottomline Auctions. The debtor testified at trial that when confronted by Mr. Mata he made no guarantee, either personally or on behalf of Bottomline Auctions, that Cutting Edge would receive the auction proceeds. The debtor testified that after he told Mr. Mata that Bottomline Auctions could not pay Cutting Edge, Mr. Mata then left Elyria and drove back to Richfield. However, it does not seem plausible that Mr. Mata would be so upset as to drive almost an hour to publicly confront and attempt to embarrass the debtor, only to immediately leave as soon as he was told that Bottomline Auctions could not pay Cutting Edge. Mr. Mata's testimony that, in response to Mr. Mata's warning that he would go to the police, the debtor said he would "personally promise" that Cutting Edge would receive its money seems more plausible. Mr. Mata arrived on a busy day at the warehouse, and the debtor himself testified that he had work to do and it was not a convenient time to have the discussion with Mr. Mata. It seems more likely than not that the debtor would

15

say what he felt he needed to say to persuade Mr. Mata to leave so that the debtor could get back to work.

Second, Cutting Edge must show that the debtor intended to deceive Cutting Edge. The Court concedes that the question of the debtor's intent is a close one and that the Court has no way of knowing for certain whether the debtor had such an intent. Nevertheless, for the reasons stated, the Court finds that the debtor did intend to deceive Cutting Edge. When Mr. Mata asked about the auction proceeds, Mr. Mata was told that a check for the auction proceeds had been mailed, even though Cutting Edge never actually received a check. When the debtor and Mr. Mata spoke, the debtor initially told Mr. Mata that Bottomline Auctions could not afford to turn over the auction proceeds. Although the debtor told Mr. Mata that Cutting Edge would receive its money after Mr. Mata warned that he intended to take legal action, the debtor's initial statement that Bottomline Auctions could not afford to pay Cutting Edge suggests that the debtor knew at the time that Cutting Edge would not receive the auction proceeds. The debtor's testimony at trial also confirms the fact that at the time the debtor met with Mr. Mata, the debtor knew that Bottomline Auctions was struggling financially and would not be able to pay Cutting Edge.

16

Third, Cutting Edge must show that it justifiably relied on the debtor's false representation. The Court finds that Cutting Edge justifiably relied on the debtor's false representation. Mr. Mata had previously dealt with Bottomline Auctions, both as a seller and as a purchaser, and everything had gone smoothly in those transactions. In fact, when Mr. Mata went to confront the debtor, the debtor acknowledged that Mr. Mata was "one of [Bottomline Auctions'] best customers." Therefore, Mr. Mata had no reason to believe that he could not trust the debtor when the debtor personally guaranteed that Cutting Edge would receive the auction proceeds. When Mr. Mata drove to Elyria and spoke with the debtor, Mr. Mata told the debtor that if a timetable for payment was not given, Mr. Mata would pursue legal action regarding the auction proceeds. After this statement, the debtor "personally promise[d]" Mr. Mata that Cutting Edge would receive the auction proceeds within two weeks. According to Mr. Mata's testimony, he waited for two weeks after the meeting to go to the police. Mr. Mata relied on the debtor's promise and waited for Cutting Edge to receive payment instead of going to the police or a lawyer immediately.

Finally, Cutting Edge must show that its reliance on the debtor's false representation was the proximate cause of Cutting Edge's loss. The Court finds that Cutting Edge's reliance on the debtor's false representation was the proximate

17

cause of Cutting Edge's loss. A creditor's promise to forebear from collection of a debt constitutes an "extension of credit" under § 523(a). *See Wolf v. Campbell (In re Campbell)*, 159 F.3d 963, 966 (6th Cir. 1998). Additionally, a creditor "need not also show that [it] could have collected on the loan prior to the bankruptcy but for the new extension of credit." *Id.* at 966-67 ("A[n] . . . 'extension of credit' is sufficient without showing further damage."). Mr. Mata, on behalf of Cutting Edge, did not take legal action while waiting for the payment promised by the debtor. The reason he did not take legal action was because, according to Mr. Mata's testimony, he believed the debtor when the debtor "personally promise[d]" to get Cutting Edge the payment within two weeks of the meeting. The entire reason for Mr. Mata's trip to the warehouse was to confront the debtor and collect the money owed to Cutting Edge. Instead, because he believed the debtor's assurances, Mr. Mata left Elyria without any payment and returned to Richfield.

Accordingly, the Court finds that Cutting Edge has established the elements for nondischargeability under § 523(a)(2)(A) and applicable Sixth Circuit case law. And although Cutting Edge did not expressly seek a money judgment against the debtor for the unpaid auction proceeds in Count Two of its adversary complaint, the Court believes that this request is implicit in Cutting Edge's claim for relief

18

(*see* Docket No. 1 at ¶ 22). Furthermore, under Bankruptcy Rule 7054 and Civil Rule 54(c) a final judgment, other than a default judgment, "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c).

## CONCLUSION

For the reasons stated above, the Court finds that Cutting Edge has established by a preponderance of the evidence that the debtor personally guaranteed payment of the unpaid auction proceeds and that this debt should be nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. The Court therefore enters a nondischargeable judgment in favor of Cutting Edge and against the debtor in the amount of $5,165.77.

IT IS SO ORDERED.